[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case arises out of a judgment of dissolution of marriage dated October 22, 1997. Pursuant to a separation agreement incorporated into the judgment, the plaintiff, Cindy (Maltas) Fredrickson, was granted custody of the minor child of the marriage, Brittany Maltas, born April 7, 1991. The defendant, Richard Maltas, was granted rights of CT Page 13640 visitation. On December 21, 1998, the court (Owens, J.) granted Mr. Maltas's motion to modify the judgment by awarding sole custody and primary legal residence to Mr. Maltas. By motion dated May 12, 1999 (#174) Ms. Fredrickson moved that the court's order of December 21, 1998 be modified so that Ms. Fredrickson would again have sole legal custody and primary residence. This motion was heard over four trial days. The court received testimony from the parties, a family service evaluator, the plaintiffs fiance, the defendant's wife, and three people from Brittany's school. Several exhibits were submitted as evidence.
Connecticut General Statutes, Section 46b-56 requires that the court's decision on a motion to modify a custody decree must be based on the best interests of the children. In order to prevail on a motion to modify custody, the moving party must prove by a preponderance of the evidence,Cookson v. Cookson, 201 Conn. 229, 240 (1986), that there has been:. . . . . a material change of circumstances which alters the court's finding of the best interests of the child or a finding that the custody order sought to be modified was not based upon the best interests of the child." Hall v. Hall, 186 Conn. 118, 122
(1982). Because the original custody order was based on the best interests of the child, the plaintiff is required to prove a material change in circumstances affecting the court's findings of the children's best interests. Not all changes in circumstances since the date of the judgment are material. Simons v. Simons, 172 Conn. 341,344 (1977). Although a change in circumstances since the prior order of the court is required, the ultimate test is the best interests of the child. Brubeck v. Burns-Brubeck, 42 Conn. App. 583,585 (1996)' citing Stewart v. Stewart, 177 Conn. 401, 407-408 (1979);Ireland v. Ireland, 246 Conn. 413, 430 (1998).
Ms. Maltas argues that there has been a material change of circumstances since the December 21, 1998 order of the court awarding custody and primary residence to Mr. Maltas. She points out that on August 13, 1999 the parties reached an agreement that was approved by the court which permitted Brittany to live with her mother in Bethel during the week so that Brittany could attend the Bethel schools. She argues that this change represents a material change of circumstances. The case of Stewart v. Stewart, 177 Conn. 401 (1979) supports the position taken by Ms. Fredrickson. In that case the plaintiff mother was awarded custody of her minor children at the time of the dissolution. Later, she unilaterally turned the children over to their father because of financial conditions. Thereafter, the defendant father obtained a modification of the judgment despite the argument of the mother that there had been no material change of circumstances. The Supreme Court affirmed the modification of custody and stated that the unilateral action of the plaintiff in turning over the children to the father, even CT Page 13641 though claimed to have been caused by financial difficulties, is a sufficient change of circumstance to make the question of custody reviewable. Id., at 408. In this case, the agreement to allow Brittany to live with her mother and to go to school in Bethel is a material change of circumstance which makes the question of custody reviewable.
Once a material change of circumstance was shown, it became the burden of Ms. Fredrickson to prove by "a preponderance of evidence that it is in Brittany's best interest to grant sole legal custody and primary residence to Ms. Fredrickson. For the reasons set forth below, she has failed to sustain her burden of proof.
The parties were married on April 27, 1993, when Brittany was two years old. They were divorced on October 22, 1997. Ms. Fredrickson was granted sole custody but both parties were to equally share the major decisions affecting the child such as education, religious beliefs, medical care and general welfare. Mr. Maltas was granted rights of visitation which were to begin with supervised visitation and were to progress to unsupervised overnight visitation. On about February 13, 1998, Ms. Fredrickson took Brittany and moved out of the State of Connecticut without the knowledge or permission of Mr. Maltas. From that time on, Ms. Fredrickson and Brittany lived under assumed names in hiding from Mr. Maltas. On December 21, 1998 Mr. Maltas was granted sole legal custody of Brittany. Mr. Maltas engaged in a search for his ex-wife and daughter which eventually located them in Georgia in March 1999. Ms. Fredrickson had been missing with Brittany for over one year. During this time, Mr. Maltas had been denied any contact with his daughter.
On March 30, 1999 Mr. Maltas began action in Georgia to enforce his rights of custody. Ms. Fredrickson fought this action. While the proceeding was pending, the court in Georgia ordered that Brittany be placed in foster care. On June 25, 1999 Mr. Maltas was successful in his action and was permitted to return to Connecticut with Brittany. Brittany lived with Mr. Maltas during the summer of 1999. Although there was no court order of visitation, Mr. Maltas permitted Ms. Fredrickson to visit with Brittany several times under supervision. As the summer drew to a close, the parties were able to reach an agreement that allowed Brittany to return to the elementary school in Bethel where she had gone before she left Connecticut with her mother. This happened because Mr. Maltas was willing to allow Brittany to live with her mother if Ms. Fredrickson moved to Bethel.
In September, 1999 Ms. Maltas moved back to Bethel and Brittany began to live with her during the school week and visit with her father on two out of every three weekends. At first, Ms. Fredrickson lived in an apartment in Bethel on the second floor of a two-family house. Within a CT Page 13642 few months she moved to a run-down house in Bethel which she attempted to repair. In June 2000 Ms. Fredrickson moved with Brittany to Woodbridge to live with her fiance, Martin Esparo. As a result, Ms. Fredrickson immediately enrolled Brittany in the Woodbridge schools in September 2000. This change of schools was made without any prior discussion with Mr. Maltas who still has sole custody.
In support of her motion to modify custody Ms. Fredrickson offered the testimony of the Family Services Evaluator, Michelle Balke. Ms. Balke prepared an initial report dated May 12, 2000 and then an updated report dated September 11, 2000. Both reports are thorough and well-documented. Ms. Balke recommended that the parents be granted joint custody, with the child primarily residing with the mother, with parenting time with the father on two of three weekends and one evening during the week. Ms. Balke admits that she has concerns about Ms. Fredrickson's stability, judgment and credibility. She admits that she is concerned about the mother's commitment to providing access to the father. She has no concerns about the father in these areas. She admits that in all other areas of parenting she feels that the father is at least as strong as the mother. Ms. Balke's sole reason for recommending primary residence to Ms. Fredrickson is that Brittany's situation is stable at the moment and it would be "risky" to make a change in the status quo. The that the facts found by Ms. Balke do not match her recommendation. The facts found by Ms. Balke support the conclusion that Mr. Maltas should have sole custody and primary residence. The court is not bound to accept the expert opinion of a family relations officer; it may rely on whatever parts of an expert's opinion the court finds probative and helpful. Yontefv. Yontef, 185 Conn. 275 (1981).
In determining the best interests of Brittany, the court has considered all of the factors which have been recognized by the appellate courts of this state as being relevant. See, Rudolewicz v. Rudolewicz, 12 CLT 39 (October 6, 1986). The following factors are found to be especially significant.
1. Character.
In Hall v. Hall, 186 Conn. 118 (1982) the Supreme Court recognized that the mother's willful disobedience of court orders which continued for several months evidenced gross disrespect for the law and raised questions about the welfare of the child. Id., at 124. The same questions can be raised about the character of Ms. Fredrickson. At the time of the December 21, 1998 order which Ms. Fredrickson seeks to modify, she was living in Georgia in hiding. She had given Brittany a fictitious name, Katie Peters, and was violating the orders of the court by failing to provide Mr. Maltas with visitation. This was wilful disobedience of a CT Page 13643 court order. These actions certainly raise serious questions about the character of Ms. Fredrickson. These questions increased when she moved to Woodbridge in June 2000 and changed Brittany's school without any prior discussion with Mr. Maltas who still had sole custody. If sole custody means anything it means the right to make decisions regarding education. The primary reason that Mr. Maltas agreed to let Brittany live with her mother during the week was so that she could experience a degree of stability by returning to a familiar school in Bethel. Ms. Fredrickson frustrated that purpose by unilaterally moving to Woodbridge and enrolling Brittany in school there. This amounts to wilful disobedience of a court order. The character of Ms. Fredrickson has been damaged badly by her own actions.
2. Willingness to facilitate visitation.
One of the factors which may be considered in determining the best interests of the child is the willingness of each parent to facilitate visitation by the non-custodial parent. Seymour v. Seymour, 180 Conn. 705,713 (1980). This factor illustrates a striking difference between the parties. As has been noted, Ms. Fredrickson's history is poor in this area. She hid the child from Mr. Maltas for months. From the date of Mr. Maltas's custody order on December 21, 1998 until he Located mother and child in Georgia on March 30, 1999, he was denied any contact with his daughter. Obviously Ms. Fredrickson did everything in her power to frustrate visitation between father and child. By contrast, Mr. Maltas has gone well beyond the call of duty in facilitating visitation with Ms. Fredrickson. He permitted supervised visitation during the summer of 1999 even when there was no visitation order and even after his own visitation rights had been denied for so long. Mr. Maltas has put aside the bitterness he must feel toward Ms. Fredrickson and has voluntarily included Ms. Fredrickson in Brittany's first communion service and at a horse show in which Brittany was riding. The court has no doubt that Mr. Maltas will continue to facilitate visitation with Ms. Fredrickson. On the other hand, the past history of this case gives the court no confidence that Ms. Fredrickson will facilitate visitation with Mr. Maltas if she obtains sole custody.
3. Credibility.
Credibility may be considered when weighing the best interests of the child. Yontef v. Yontef, 185 Conn. 275, 277 (1981). Unfortunately for Ms. Fredrickson, her credibility is quite low when based upon the accuracy of her own testimony. She testified that Mr. Maltas provided her with no child support from August 1999 until February 2000. This testimony was shown to be wrong when Mr. Maltas introduced canceled checks for child support beginning on October 15, 1999 and continuing on CT Page 13644 a weekly basis thereafter, together with additional checks for back support beginning when Mr. Maltas agreed to allow Brittany to live with her mother in Bethel. Ms. Fredrickson also testified that she supported Brittany's participation in horseback riding but that she could not afford to make any financial commitment to it. It became clear to the court that, in fact, Ms. Fredrickson was not really in favor of horseback riding at all. If she truly feels that it is an appropriate activity for Brittany she certainly has the financial ability to help pay for it. Finally, Ms. Fredrickson's explanation of why she no longer feels that Mr. Maltas is a danger to Brittany lacks the ring of truth. Ms. Fredrickson would like the court to think that she was so fearful in 1999 that she was willing to defy court orders and live in hiding. Now, she claims to have no fears. The court is forced to draw the conclusion that she was untruthful in 1999 or is untruthful now.
On the other hand, the court has no questions about the credibility of Mr. Maltas.
4. Continuity and stability of environment.
A court is permitted to compare the continuity and stability of the environment provided by each parent. Cappetta v. Cappetta, 196 Conn. 10,16 (1985). In this case the comparison is stark. Mr. Maltas lives and works in the building where he was raised. His parents own the building which contains the family cleaning business as well as the apartment where he lives with his wife and young son. There is a large extended family in the area which gets together for many social events. The home is a few doors down from the church where Mr. Maltas and his family worship and where Brittany is receiving her religious training. Mr. Maltas is remarried and he and his wife, Marianne, have a two-year old son, Devin. Britanny has a good relationship with her step-mother and, of course, with her little brother. This is a family situation which is stable and solid.
The court hopes that Ms. Fredrickson has found stability in her life. Since June 2000 she has lived in Woodbridge with her fiance. She plans to get married in December. She and her future husband are building a house on land adjoining the house where they live. Her fiance has lived here for many years and is settled in the area with family and friends surrounding him. This is the kind of stability which Brittany needs after what she has been through in the past two years. Since December 21, 1998 Brittany has lived in Georgia with Ms. Fredrickson, has lived in a foster home in Georgia while Ms. Fredrickson engaged in a futile attempt to fight Mr. Maltas's Connecticut custody order, has lived in Ridgefield with Mr. Maltas, then lived in two different homes in Bethel with Ms. Fredrickson, and then in Woodbridge with Ms. Fredrickson and her fiance. CT Page 13645 Brittany has attended three different schools during this time. Since Brittany has been attending school in Woodbridge since September of this year, the court is aware that another change of schools may be upsetting to her. But, Brittany needs a stable environment. Since history is the best predictor of future behavior, the court feels safe in concluding that Mr. Maltas is more likely to provide the stable environment which Brittany needs. In order to reduce the confusion for Brittany as much as possible, the change of schools and primary residence will be made during the Christmas recess.
5. The wishes of the child.
Connecticut General Statute Section 46b-56 (b)(1) provides that in modifying any order with respect to custody or visitation the court shall be guided by the best interests of the child "giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference. . . ." Here, Brittany, age 9, has expressed her wishes through her attorney that she prefers to have things stay the way they are now with her living with her mother during the week and visiting with her father on the weekends. The court has given consideration to these wishes. However it is best to remember that:
 "A child caught up in the maelstrom of family strife may produce, to the psychologically untrained eye and ear, distorted and thus misleading images not only of the child's parents but of the child's own feelings; and those feelings themselves may be transient."
Gennarino v. Gennarino, 2 Conn. App. 132, 137 (1984). For this reason, Brittany's expressed wishes do not out-weigh all of the other factors which point toward sole custody and primary residence in the father.
The court finds that the following orders are in the best interests of the minor child, Brittany Maltas.
1. The defendant, Richard Maltas, shall maintain sole custody of the minor child. The minor child shall continue to reside with the plaintiff, Cindy Fredrickson, until Friday, December 29, 2000 at 6:00 p.m. at which time Mr. Maltas shall be designated as the primary residential parent and shall be responsible for the day-to-day care and upbringing of the minor child. The defendant shall discuss matters pertaining to the child's education, religious training, discipline, moral values, medical and dental care, and social, financial and traveling activities with the plaintiff mother, and shall consider the mother's opinions and recommendations with a view to arriving at a harmonious policy calculated to promote the best interests of the child. CT Page 13646
2. Until Friday, December 29, 2000 at 6:00 p.m. Mr. Maltas shall have visitation access to the minor child as follows:
From 6:00 p.m. November 24, 2000 until 6:00 p.m. November 26, 2000
From 6:00 p.m. December 8, 2000 until 6:00 p.m. December 10, 2000
From 6:00 p.m. December 23, 2000 until 6:00 p.m. Christmas Day, December 25, 2000 at 1:00 p.m.
3. After December 29, 2000, Ms. Fredrickson will have reasonable, liberal and flexible access to the minor child which shall include:
During the school year: Alternate weekends, extending from 4:00 p.m. Friday until Sunday at 7:00 p.m., except for weekends with a Federal Monday holiday, in which case visitation shall extend until 7:00 p.m. on Monday. The first visitation weekend will begin on Friday January 12, 2001. Ms. Fredrickson will collect the child from and return the child to Mr. Maltas's residence or, in the alternative, from the Ridgefield Dunkin' Donuts.
Each Thursday afternoon following a weekend with Ms. Fredrickson and each Tuesday afternoon following a weekend with Mr. Maltas from the end of the child's school day until 8:00 p.m. The first such mid-week visitation shall be on Tuesday January 9, 2001. Ms. Fredrickson will collect the child directly from school and return her to Mr. Maltas's home or, in the alternative, to the Ridgefield Dunkin' Donuts. The visits will take place in the Ridgefield/Danbury/Bethel area and the child will not be transported to Ms. Fredrickson's present residence in Woodbridge. The child shall do her homework and have dinner before return to Mr. Maltas.
No makeup visitation time will be scheduled for visits missed unless the minor child is ill or unless there is mutual agreement.
During the summer school vacation: From 7:00 p.m. on the Sunday evening following the close of school until 7:00 p.m. on the Sunday immediately preceding the resumption of school, subject to:
Alternate weekends with Mr. Maltas extending from 4:00 p.m. Friday until Sunday at 7:00 p.m., and each Wednesday afternoon from 4:00 p.m. until 8:00 p.m. The Wednesday afternoon visits shall take place in the Woodbridge/New Haven area and the minor child shall not be transported to Mr. Maltas's residence in Ridgefield. Mr. Maltas will collect the child from and return the child to Ms. Fredrickson's residence or, in the CT Page 13647 alternative, from the Woodbridge Police Station.
Ms. Fredrickson shall be entitled to two weeks uninterrupted vacation with the child, which weeks shall be taken during the month of July. Each such week shall begin at 7:00 p.m. on Sunday evening following a weekend with Mr. Maltas and continue until 7:00 p.m. on the second Sunday evening following. Ms. Fredrickson will give written notice of the two weeks she elects by April
Mr. Maltas shall also be entitled to two weeks uninterrupted vacation with the child. Each such vacation shall begin at 7:00 p.m. on the Sunday evening following a Mother's weekend with the child and continue until 7:00 p.m. on the second Sunday evening following. Mr. Maltas will give written notice of the two weeks he elects by April 30;
In odd numbered years, provided Ms. Fredrickson shall have available vacation time, the Minor Child shall spend her school spring vacation with the Plaintiff Mother.
In even numbered years, and in odd numbered years if Ms. Fredrickson is unable to exercise vacation time, the Minor Child shall spend her school spring vacation with Mr. Maltas.
Neither parent will schedule activities for the child during time the child is scheduled to be with the other parent without the advance agreement of the other parent. Mr. Maltas may, however, enroll the child in extracurricular activities which have occasional practices, events or games scheduled on weekends or on the week nights the child spends with Ms. Fredrickson and Ms. Fredrickson will accommodate the child's attendance;
Both parents may attend sporting events, school activities, scout meetings, etc. in which the child is involved notwithstanding the visitation schedule;
Both parents may volunteer to assist with the child's activities as coach, scout leader, room mother, chaperon, etc.
If either parent plans to arrange for child care for a period of longer than three hours, the other parent shall have a right of first refusal to care for the child. Holidays:
Holiday visitation will preempt regular and vacation visitation. Unless otherwise specified, holiday visitation shall extend from 8:00 a.m. until 8:00 p.m. CT Page 13648
Beginning in 2001, Ms. Fredrickson shall enjoy the following holidays with the minor child in odd numbered years:
Christmas Eve from 8:00 a.m. until Christmas Day at 1:00 p.m.;
President's Day;
Memorial Day;
Labor Day;
Halloween between 4:00 p.m. and 8:00 p.m.;
Beginning in 2002, Ms. Fredrickson shall enjoy the following holidays with the minor child in even numbered years:
Christmas Day from 1:00 p.m. until 7:00 p.m. on January 1;
New Year's Day;
Martin Luther King Day;
Easter;
July 4th;
Columbus Day.
Thanksgiving break from 8:00 a:m. on Thursday until Sunday evening at 7:00 p.m.
Mother's Day shall always be spent with the Mother; Father's Day shall always be spent with the Father.
The child shall be made available to the other parent for two hours on the child's birthday.
4. The Minor Child shall remain in counseling and the cost of that counseling shall be shared equally by the parties.
5. The current support order will remain in effect until January 1, 2001. Thereafter, Ms. Fredrickson, shall pay child support in the amount of $213.00 per week. This order is in compliance with the Child Support Guidelines.
6. Ms. Fredrickson shall maintain health insurance for the minor child CT Page 13649 as it is available through her employment. Yearly, she shall pay the first $100.00 of Brittany's health expenditures riot paid by insurance; thereafter, in accordance with the Guidelines, she shall pay 75% and Mr. Maltas shall pay 25% of health expenditures not paid by insurance. Health expenditures are to be broadly construed to include but not be limited to: medical, dental, hospital, orthodontic, pharmaceutical, eyeglasses, optometric and opthamalgic, psychological, psychiatric, and physical therapy.
7. The parties shall each pay one-half of the fees and costs of Attorney Sharon Wicks Dornfeld, attorney for the Minor Child, the total of which was $11,550.00. Each party has made a payment of $250.00. Therefore, each party owes $5,525.00 which they are ordered to pay within 45 days.
8. Each party will keep the other informed of the whereabouts, including a telephone number, of the Minor Child if the Minor Child will not be sleeping in the residence of the parent for two or more' nights. Either parent may take the child out of state overnight on holidays or for vacations or visitation, so long as notice of the address and telephone number of the destination is provided to the other parent in advance of the departure.
9. Each of the parents will promptly notify the other if either has any knowledge of any illness or accident seriously affecting the health or welfare of the child (defined as requiring the services of a physician). No notice will be necessary of routine medical or dental appointments, nor shall Ms. Fredrickson be entitled to be present for such appointments. Except in the case of emergencies, Ms. Fredrickson shall not seek the services of a physician or dentist for the Minor Child.
10. Both parents will encourage telephone and mail contact between the child and the other parent, and assist the child in calling and writing to the other. Both parents are advised that the child may express a wish to see or talk to the other parent during times they are not scheduled to be with hum or her and it serves the child's interests to be sensitive to the child's wishes and needs and to facilitate the contact with the other parent that will reassure the child.
11. Each parent will employ either an answering machine, fax, beeper or answering service at all times and will respond to inquiries and messages left by the other parent promptly. The Minor Child is not to be used to convey checks or messages, verbal or written, between the parents. Neither parent will do or say anything to or in the presence of the Minor Child which would tend to detract from the ordinary love and affection of the Minor Child for the other parent. CT Page 13650
12. Ms. Fredrickson shall have the right of access to all academic, medical, hospital or other health records of the Minor Child.
13. Each parent will keep the other informed of the child's school, sports and extracurricular activities and provide the other parent with notice of special events to which parents and/or the public are invited and will provide the other parent with "parent tickets" if distributed or made available for the special event.
14. Each parent is expected to adapt to the changing needs and interests of the Minor Child, and to arrange his or her schedule to accommodate the Minor Child's birthday party invitations, play dates, etc., remembering that such activities are an ordinary part of the child's development and that the Minor Child will enjoy those activities and benefit from them.
15. Each parent will ensure that all of the Minor Child's clothing, toys and equipment are returned with the child to the parent who purchased the items so that the Minor Child may use and enjoy them while with that parent.
16. Both parents are cautioned that the high degree of animosity between them is detrimental to the Minor Child and that engaging in ongoing counseling would be of assistance to each of them in resolving disagreements which may arise in the future.
 JOHN W. PICKARD JUDGE OF THE SUPERIOR COURT